***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with the modifications made regarding the average weekly wage computation and the disputed four days of disability.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a pre-trial agreement as
 STIPULATIONS
1. Employee-plaintiff is Flay C. Scronce, Jr.
2. Employer-defendant is ABF Freight System, Inc.
3. The employer-defendant is self-insured.
4. Employee-employer relationship existed.
5. The average weekly wage is to be determined by the Industrial Commission
6. The date of the alleged injury by accident was February 9, 1996.
7. The employer-defendant regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
8. Defendant admitted liability for benefits under the Workers' Compensation Act for this claim and paid compensation to plaintiff for temporary total disability until June 2, 1996 and from February 6, 1997 to March 3, 1997. Defendant also paid temporary partial disability benefits from November 26, 1996 until February 1, 1997.
9. In addition, the parties stipulated into evidence the following items: six pages of Industrial Commission forms, print-out of wage records, beginning with the date of merger of ABF with Carolina Freight, plaintiff's personnel file, a packet of medical records and reports, which were submitted after the hearing and a packet of vocational reports, which were also submitted after the hearing.
10. The depositions of Dr. Weens, Dr. Koontz and Stan Jenkins are hereby made a part of the record.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff was born August 23, 1967 and is a high school graduate. He began working for defendant's predecessor, Carolina Freight, in 1985 as a dock worker. When ABF Freight System bought the company in 1995, he continued to work as a dock worker for the new company, although he moved to the Kernersville facility. His job involved taking freight off of trucks and transferring it to other trucks or to the proper location for subsequent loading. He used hand trucks, barrel trucks, forklifts and floats to move a variety of freight, including items such as drums and kayaks.
2. On February 9, 1996 plaintiff sustained a hernia while pulling a dock plate onto a truck, which would have allowed him to drive a forklift onto the truck. He saw his family doctor on February 13, 1996 and was referred to Dr. Beutel, a general surgeon. Dr. Beutel examined him on February 22, 1996 and recommended surgery to repair the hernia. Plaintiff underwent the operation on March 20, 1996 on an outpatient basis. However, he was admitted to the hospital two days later for treatment for pneumonia and cellulitis of the incision. Dr. Beutel followed his recovery and allowed him to return to work in May. On May 17, 1996 plaintiff reported that he was doing well, so the doctor released him from medical care.
3. Although defendant did not file proper forms with the Industrial Commission, it admitted liability for benefits under the Workers' Compensation Act and paid plaintiff for medical treatment as well as compensation for temporary total disability. Plaintiff returned to work at his regular job in approximately June 1996.
4. On September 26, 1996 plaintiff went back to Dr. Beutel with complaints of persistent pain at the surgical site, especially with activities like coughing. Dr. Beutel prescribed medication for him and subsequently injected the area. The injection gave him temporary relief but the pain returned. His symptoms persisted despite conservative treatment so plaintiff was sent to Dr. Koontz, another general surgeon, for a second opinion. Dr. Koontz evaluated him on February 6, 1997 and was of the impression that his ilioinguinal nerve was probably trapped in scar tissue from the surgery. It was an unusual problem, which was difficult to treat. Dr. Koontz offered him the option of surgery but made no promises that his condition would improve. Plaintiff chose to undergo the operation, which was performed February 13, 1997. Dr. Koontz explored the right inguinal area and removed the mesh, which had been inserted in the first operation.
5. Plaintiff obtained significant relief from the second operation, although he continued to have some pain on occasion. Dr. Koontz released him to return to work on April 1, 1997 without restrictions and he did return to work at his regular job. During the time he was out of work, he received workers' compensation benefits.
6. During the year after his release by Dr. Koontz, plaintiff mentioned having some inguinal pain to his family doctor on a couple of occasions but did not specifically seek medical treatment for such problems until April 7, 1998 when he told Dr. Weems that he had been doing heavy lifting and putting in fence posts on the family farm and had developed increased groin pain. Dr. Weems did not find a recurrent hernia on examination, so he prescribed anti-inflammatory medication and kept plaintiff out of work for two days. Plaintiff went back to Dr. Koontz on May 19, 1998 reporting that he was still having pain in the area of his surgery. Dr. Koontz also found no evidence of a recurrent hernia on examination and was unable to explain what was causing the symptoms. Consequently, he had no treatment recommendations. He suggested that plaintiff should find another line of work, but plaintiff was unwilling to consider that option.
7. Plaintiff did not seek further treatment for almost a year. However, on April 26, 1999 he went to Dr. Weems complaining that he felt like he had pulled something in his groin. He had reportedly been fishing and riding horses two weeks before and had noticed gradually increasing symptoms since that time. However, he had told a supervisor at work that he had been shoveling sweet potatoes. Dr. Weems recommended that he get another surgical opinion. On May 4, 1999 plaintiff was seen at Primecare for these complaints and was given the same recommendation, so he was then examined by Dr. Middleton, another general surgeon. He described his injury and course of medical treatment and told the doctor that he was fifty-percent improved from the second operation but that he had continued to experience some symptoms. He wanted to be pain-free. Dr. Middleton discussed treatment options, including surgery, but offered only a fifty-percent chance of improvement with another operation while pointing out that there would be a real risk for undesirable side effects if he underwent a third surgical procedure.
8. Plaintiff then saw Dr. Heili, another surgeon, on May 6, 1999. Dr. Heili was of the opinion that the symptoms were primarily consistent with ilioinguinal nerve entrapment and he recommended a trial of nerve blocks before considering surgery. The next day plaintiff returned to Dr. Weems, and they discussed his options at length, particularly the potential for collateral damage from surgery. Plaintiff concluded that he did want an operation and expressed the desire to take off from work for a period time to see if the symptoms would resolve, but he was afraid he would lose his job.
9. On May 26, 1999 plaintiff returned to Dr. Weems with another flare-up, this time after working on his truck. Dr. Weems prescribed anti-inflammatory medication for him and referred him to Dr. Sanchez, an occupational specialist, for evaluation. Dr. Sanchez examined him the next day. Plaintiff described his injury and medical treatment and advised the doctor that he would get flare-ups of pain at the surgical site, which would then resolve. Dr. Sanchez advised that he could not determine that plaintiff had any permanent impairment from a functional standpoint and released plaintiff to continue working at regular duty.
10. In June 1999 plaintiff began calling Dr. Koontz's office trying to get another appointment. Since Dr. Koontz had no further treatment to offer plaintiff, he advised that plaintiff should go to a pain clinic. However, defendant would not authorize the pain clinic even with a written prescription. Dr. Weems then arranged for plaintiff to be seen by Dr. Bullard at Southeast Pain Care on July 9, 1999. Dr. Bullard recommended acupuncture and an additional medication.
11. The only record of plaintiff receiving more medical treatment for his hernia-related problems was for a final examination by Dr. Koontz on April 12, 2000. Dr. Koontz recommended that he not have further surgery and that pain management be provided.
12. Plaintiff requested this hearing to claim additional compensation for temporary total disability and to have defendant ordered to provide him with the pain management treatment recommended by Dr. Koontz. In support of his position regarding disability, he testified that he missed considerable work after both operations due to persistent groin pain and that he had been unable to perform his regular job duties since June 1999 as a result of this injury. Although he clearly did miss considerable time from work following his recovery from both operations, he grossly exaggerated the amount of time he missed due to groin pain. Except for the periods associated with his initial injury and his operations, he missed a total of four days due to groin pain in the two-year period between his release from his second operation and his office visit with Dr. Weems on May 26, 1999. On the two occasions when he missed work because of this problem, his condition had been aggravated by activities he had performed away from work. His work duties were not the cause of the flare-ups.
13. Plaintiff had a long-standing problem with absenteeism, which preexisted the injury in question. He had been written up for missing nineteen days of work between April 14 and August 30, 1994 and for missing eleven days between August 9 and October 28, 1996. Since he was habitually absent, he was required to provide a doctor's excuse in order to return to work after an absence. In February 1998 he was written up for missing twenty-three shifts between December 2, 1997 and January 24, 1998, plus leaving early four times; and on November 23, 1998 he was written up for missing thirty-seven shifts between August 1 and November 14, 1998, plus nine partial shifts. Although plaintiff had some other unrelated medical problems, none of them were serious and it appeared that there were factors, which he did not disclose which caused him to not want to work on a full time basis. The truck terminal was a union shop, so it was difficult to terminate employees. However, when plaintiff's supervisor was promoted to operations manager in April 1999, he immediately tried to have plaintiff terminated for habitual absenteeism. Since the supervisor did not follow the exact prescribed procedure, his efforts were unsuccessful and plaintiff was reinstated. It was after this episode that plaintiff decided that his hernia was too painful to continue working.
14. Even though he did not have a doctor's excuse, plaintiff stopped working in June 1999 supposedly because his hernia site was too painful. His allegation to that effect has not been accepted as credible. Although his job as a dock worker was physically heavy work, he was able to perform his job duties without difficulty, probably in large part due to the various equipment he was provided to handle the freight. It was clear from the evidence that he was also very physically active outside of work in that he worked on the family farm and would engage in recreational activities, such as horseback riding, which would stress his surgical site. Every flare-up of symptoms for which he sought medical treatment was due to activities outside of work. Although the source of aggravation did not change the fact that the underlying condition was work-related, it demonstrated that plaintiff's job duties were not the problem insofar as his flare-ups were concerned.
15. Due to his exaggeration of his symptoms and his disability, plaintiff has made it difficult to determine the extent he has accurately presented his symptoms to his doctors. Consequently, even though his treating surgeon recommended pain management, there were reasons to question the basis for the doctor's opinion. Nevertheless, it has appeared that plaintiff has had some on-going symptoms since his second operation for which surgery would not be a good treatment option. Consequently, the pain management treatment recommended by Dr. Koontz would tend to give him some relief. However, the treatment Dr. Koontz prescribed was not acupuncture but rather involved nerve blocks to try to disrupt the pain cycle.
16. Plaintiff's average weekly wage based upon the fifteen weeks prior to his injury by accident was $509.65 and his compensation rate is $339.77.
17. The parties were unable to offer specific evidence regarding plaintiff's average weekly wage because the payroll records for 1995 were not available. Defendant created this problem by failing to file proper forms with the Industrial Commission admitting liability for the claim and showing changes in or reinstatement of compensation and the dates plaintiff returned to work. Furthermore, since defendant in essence paid benefits "under the table" without filing a Form 60 or Form 21 and thereby making itself subject to the requirements of the Act, it appears that sanctions should be imposed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. On February 9, 1996 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant in that he sustained a hernia as the result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(18).
2. Defendant admitted liability for this injury by paying compensation and medical expenses and not denying the claim within ninety days. N.C. Gen. Stat. § 97-18.
3. Since plaintiff's average weekly wage has been found to have been $509.65, he would have been entitled to compensation at the rate of $339.77 per week for the time he was out of work due to his initial injury and his surgeries. He would also have been entitled to partial disability benefits based upon that average weekly wage. N.C. Gen. Stat. §§ 97-29, 97-30.
4. Plaintiff is not entitled to additional compensation for temporary total disability. N.C. Gen. Stat. § 97-29; Anderson v. NorthwesternMotor Company, 233 N.C. 372 (1951).
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including the pain management treatment recommended by Dr. Koontz. N.C. Gen. Stat. §§ 97-2(19); 97-25.
6. Having failed to comply with the requirements of the Workers' Compensation Act regarding the filing of necessary forms to admit liability for the claim, to stop payment of compensation and to reinstate or change compensation, defendant is subject to sanctions. N.C. Gen. Stat. §§ 97-18; 97-18.1; Rule 802.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay compensation to plaintiff for any underpayment of temporary total disability or temporary partial disability arising from his initial injury, surgery, change of condition and second surgery. Compensation for temporary total disability shall be paid at the difference between his compensation rate of $339.77 per week and the actual rate defendant paid him at the time. Compensation for temporary partial disability shall be paid based on the difference between the amount to which he was actually paid and what he would have been entitled had he been paid at the rate of two-thirds of the difference between an average weekly wage of $509.65 and his weekly earning while working at light duty. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Plaintiff's claim for additional compensation is DENIED.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from the pain management treatment recommended by Dr. Koontz.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Mr. Roberts.
5. Defendant shall pay sanctions in the amount of $2,500.00 to the Industrial Commission for its failure to comply with the Workers' Compensation Act and Industrial Commission Rules in this case.
6. Defendants shall pay the costs.
This the 28th day of May 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN